UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SHELLANY RAY,                          )
                                       )
          Plaintiff,                   )
                                       )          CIVIL ACTION NO.
VS.                                    )
                                       )          3:19-CV-3055-G
RECOVERY HEALTHCARE                    )
CORPORATION, et al.,                   )
                                       )
          Defendants.                  )

**MEMORANDUM OPINION AND ORDER**

Before the court is the defendant Recovery Healthcare Corporation

("Recovery")'s Motion to Dismiss (docket entry 42) ("Recovery Motion to Dismiss")

and the defendant Alcohol Monitoring Systems, Inc. ("AMS")'s Motion to Dismiss

(docket entry 40) ("AMS Motion to Dismiss") (collectively, "the defendants" and

"the motions to dismiss").  For the reasons set forth below, the motions to dismiss

are **GRANTED** in part and **DENIED** in part.

I.  BACKGROUND

A.  Factual Background

This suit arises out of the plaintiff Shellany Ray ("Ray")'s required use of an

ankle monitor designed to determine whether Ray consumed alcohol in violation of

the conditions of her probation.  Second Amended Complaint (docket entry 35)

("SAC") ¶¶ 8, 15.

AMS produces an ankle monitor (known as a "SCRAM device") that is designed to determine whether the wearer has consumed alcohol. *Id.* ¶ 8. Probationers are usually required to wear the SCRAM devices 24 hours per day, seven days per week in compliance with probation terms prohibiting alcohol use. *Id.* Once per day, the SCRAM device uploads monitoring data collected throughout the day to the internet. *Id.* The data is then transmitted to a central data center operated by AMS where the data is reviewed to determine if any "monitoring 'event' occurred that indicates that the wearer ingested alcohol." *Id.*

Unlike traditional blood-alcohol monitoring which directly measures the level of alcohol present in the blood stream, the SCRAM device "relies on transdermal alcohol monitoring." *Id.* ¶ 9. Transdermal alcohol monitoring "operates by detecting the amount of alcohol that evaporates through the skin." *Id.* The SCRAM device takes measurements of transdermal alcohol levels every 30 minutes. *Id.* ¶ 18. Because blood-alcohol content ("BAC") is not measured directly, transdermal alcohol monitoring requires "the use of an algorithm to approximate the blood alcohol content of the wearer based on the amount of alcohol vapor detected at the skin surface." *Id.* ¶ 9.

Ray alleges that "the SCRAM device is by its design susceptible to detecting 'false-positive' alcohol readings" because the SCRAM device is unable to accurately distinguish between transdermal alcoholic vapors resulting from a wearer's

- 2 -

consumption of alcohol and alcoholic vapors resulting from non-ingested "environmental alcohol." *Id.* ¶ 10.  Ray asserts that environmental alcohols "take many forms, and many everyday products contain alcohol that evaporates upon exposure to air" which, in turn, can trigger a SCRAM device to detect such vapors. *Id.* ¶ 11.  Environmental alcohols, according to Ray, include "body spray, cologne, aftershave, hand sanitizer, household cleaners (such as Windex), [and] gasoline." *Id.*

Ray avers that AMS "offers its devices and services through an integrated network of distributors," including Recovery.  *Id.* ¶ 14.  Recovery allegedly "contracts with Dallas County to monitor probationers who have been convicted of alcohol offenses" and "provides those services to Dallas County in conjunction with AMS." *Id.*  Ray further maintains that AMS and Recovery "knew that the SCRAM device and its related services were unreliable" in distinguishing between environmental and ingested alcohol, and that the defendants knowingly made false representations to Dallas County about the SCRAM device's ability to do so.  *Id.* ¶¶ 14, 19.

As a result of a 2016 conviction for driving while intoxicated, Ray "was sentenced to community supervision and prohibited from consuming any alcohol." *Id.* ¶ 15.  To enforce the prohibition, the state court ordered her to wear a SCRAM device created by AMS and operated by Recovery.  *Id.*  On December 25, 2017, Ray's husband "sprayed Static Guard on the couple's bed sheets shortly before they used the bed." *Id.* ¶ 16.  Thereafter, Ray asserts, "AMS and Recovery Healthcare sent a

- 3 -

report to Dallas County probation officials indicating that [Ray] had consumed a large quantity of alcohol on that evening." *Id.* The report concluded that Ray's BAC skyrocketed from zero to 0.26 in a 30-minute span. *Id.* ¶ 18. Dallas County prosecutors issued a warrant for her arrest on January 16, 2018. *Id.* ¶ 17. Neither AMS nor Recovery alerted Ray to the positive recording, *id.* ¶ 28, and Ray allegedly became aware of the positive report only after county prosecutors issued the warrant.

Dallas County prosecutors then "filed a motion to revoke [Ray's] probation and incarcerate her." *Id.* ¶ 17. Ray turned herself in at a January 24, 2018 hearing. *Id.* At that hearing, Ray denied consuming any alcohol and explained that her husband used Static Guard on December 25, 2017, which she argued caused the spike in alcoholic vapors. *Id.* However, AMS and Recovery "insisted that Static Guard could not be the source of the alcohol reading" and "assured prosecutors and the state court that" the only explanation for the high alcohol reading was that Ray "had consumed a large quantity of alcohol." *Id.* Ray alleges that the defendant's "knew that their monitoring systems were flawed and unreliable," but that the defendants nevertheless "failed to disclose those facts to the court, instead maintaining that the SCRAM readings proved that [Ray] had consumed alcohol." *Id.* As a result of the hearing, "the state court ordered [Ray] to attend a 12-step recovery program every day for 90 days and provide proof of attendance to her probation officer." *Id.* Ray asserts that the program "created a considerable limitation on" her

ability to work.  *Id.*

    After the hearing, Ray hired Jan Semenoff, a forensic criminalist, as an expert witness to create a report demonstrating that alcohol consumption could not have caused the positive reading on December 25.  *Id.* ¶ 18.  Ray insists that "it would be nigh impossible to consume enough alcohol for one's BAC to go from zero to 0.26" in a single 30-minute interval.  *Id.*  To substantiate this assertion, Ray points to the Semenoff report which concluded that "it would be physiologically impossible for the body to process alcohol as quickly as the device suggested."  *Id.*  The  Semenoff report instead concluded that "the detected alcohol levels are consistent with environmental exposure."  *Id.*  Ray alleges that after the report was provided to prosecutors, the prosecutors "abandoned their efforts to revoke [Ray's] probation" and withdrew their motion.  *Id.*

## B.  Procedural Background

    Ray filed her initial complaint (docket entry 1) on December 26, 2019 and her First Amended Complaint (docket entry 15) on April 14, 2020.  Ray then filed the operative Second Amended Complaint on October 30, 2020.  In lieu of an answer, both defendants filed separate and independent motions to dismiss on November 20, 2020.  On December 11, 2020, Ray filed a response to the Recovery Motion to Dismiss ("Response to Recovery") (docket entry 46) and a response to the AMS Motion to Dismiss ("Response to AMS") (docket entry 47).  Finally, AMS and

Recovery filed their reply briefs (docket entries 50, 51) on December 18, 2020 and January 7, 2021, respectively.  Accordingly, the motions to dismiss are ripe for decision.

## II.  ANALYSIS

### A.  Legal Standard

#### 1.  Standard for Dismissal Under Rule 12(b)(6)

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations, quotation marks, and brackets omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that the allegations in the complaint are true (even if doubtful in fact)."  *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Id.* (quoting *Martin K. Eby Construction*

*Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004))
(internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine
whether a complaint fails to state a claim under Rule 12(b)(6).  See *Ashcroft v. Iqbal*,
556 U.S. 662, 678-79 (2009).  The court must "begin by identifying the pleadings
that, because they are no more than conclusions, are not entitled to the assumption
of truth."  *Id.* at 679.  The court should then assume the veracity of any well-pleaded
allegations and "determine whether they plausibly give rise to an entitlement of
relief."  *Id.*  The plausibility principle does not convert the Rule 8(a)(2) notice
pleading to a "probability requirement," but "a sheer possibility that a defendant has
acted unlawfully" will not defeat a motion to dismiss.  *Id.* at 678.  The plaintiff must
'plead[ ] factual content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded
facts do not permit the court to infer more than the mere possibility of misconduct,
the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to
relief.'" *Id.* at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)).  The
court, drawing on its judicial experience and common sense, must undertake the
"context-specific task," of determining whether the plaintiff's allegations "nudge" her
claims against the defendant "across the line from conceivable to plausible."  See *id.*
at 679, 683.

*2. Rule 9(b) Standard*

A complaint need only recite a short and plain statement of the claim showing that the pleader is entitled to relief.  FED. R. CIV. P. 8(a)(2).  When, however, defendants are charged with fraudulent activity, the plaintiff must state with particularity the circumstances constituting fraud.[1]  FED. R. CIV. P. 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); see also *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719, 724 (5th Cir. 2003) (stating that Rule 9(b) requires the plaintiff to lay out "the who, what, when, where, and how" of the alleged fraud).  If the facts pleaded in the complaint are within the opposing party's knowledge, fraud pleadings may be based on information and belief.  See *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1068 (5th Cir. 1994).

---

[1]     As the Fifth Circuit has noted, the purpose of the heightened pleading standard of Rule 9(b) is to provide defendants with fair notice of the plaintiff's claims, protect defendants from harm to their reputation and goodwill, reduce the number of strike suits, and prevent a plaintiff from filing baseless claims in an attempt to discover unknown wrongs.  *Tuchman v. DSC Communications Corporation*, 14 F.3d 1061, 1067 (5th Cir. 1994).

Rule 9(b) permits a plaintiff to allege generally the defendant's intent to commit fraud. FED. R. CIV. P. 9(b). ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). A mere allegation that the defendant had the requisite intent, however, will not satisfy Rule 9(b). *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994); *Tuchman*, 14 F.3d at 1068. To adequately plead fraudulent intent, the plaintiff must set forth specific facts that support an inference of fraud. *Tuchman*, 14 F.3d at 1068. The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show the defendant's motive.

In the event that a plaintiff fails to plead facts with sufficient particularity under Rule 9(b), dismissal of the action with prejudice is not automatic nor typically warranted. 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1300 (2d ed. 1990). Rather, courts usually provide an opportunity to cure the pleading "unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corporation*, 199 F.3d 239, 247 n.6 (5th Cir. 2000); see also *Cates v. International Telephone and Telegraph Corporation*, 756 F.2d 1161, 1180 (5th Cir. 1985) ("[S]uch deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend, at least not in the absence of special circumstances."). Rather, Federal Rule of Civil Procedure 15 allows trial

courts to "freely give leave [to amend] when justice so requires."  FED. R. CIV. P. 15(a)(2).

## B.  Application

Ray brings several claims against the defendants collectively and individually. Ray claims that both defendants (1) violated her civil rights under 42 U.S.C. § 1983, SAC ¶¶ 30-34; (2) engaged in deceptive trade practices prohibited by the Texas Deceptive Trade Practices Act, SAC ¶¶ 39-40; and (3) committed several torts against Ray including negligence and strict products liability, SAC ¶¶ 41-44.  Ray also brings a racketeering claim against Recovery under 18 U.S.C. § 1962, SAC ¶¶ 35-38.[2]  The court first considers the federal civil rights and racketeering claims before turning to Ray's state law claims.

### 1.  *Civil Rights Violations*

Ray seeks damages under § 1983 for violation of several of her civil rights. Specifically, Ray alleges that AMS and Recovery violated Ray's (1) Fifth and Fourteenth Amendment due process rights, Response to Recovery at 7-9, 11-12; and (2) Fourth Amendment right against unreasonable searches and seizures, *id.* at 10-

---

[2]       Ray also asserts racketeering claims against two additional defendants, namely Glenn Tubb, chief executive officer of AMS, and The Riverside Company, a private equity firm.  SAC ¶¶ 4-5, 35-36.  These two defendants allegedly "derive[ ] income from the racketeering enterprise."  *Id.* ¶¶ 4-5, 38.  At the time of writing, however, Ray has not served these two defendants.  Accordingly, the court will not consider arguments or claims against them at this juncture.

11.[3]

In response, AMS and Recovery raise a laundry list of defenses.  Both

defendants argue, *inter alia*, that: (1) Ray's § 1983 claims are barred under *Heck v.*

*Humphrey*, 512 U.S. 477 (1994), Recovery Motion to Dismiss at 5-6; (2) the

defendants did not act under color of state law as required by  § 1983, AMS Motion

to Dismiss at 9; and (3) even if the court reaches the merits of Ray's § 1983 claims,

Ray failed to plead facts sufficient to survive a motion to dismiss, *id.* at 6-9.

Recovery further asserts several theories of absolute immunity against Ray's § 1983

claims.  Recovery Motion to Dismiss at 6-9.

Ray's § 1983 claims are barred under *Heck*.  However, "[e]ven if a complaint is

subject to dismissal under *Heck*, it remains appropriate for district courts to resolve

the question of immunity before reaching the *Heck* analysis."  *Littles v. Board of*

*Pardons and Paroles Division*, 68 F.3d 122, 123 (5th Cir. 1995) (citing *Boyd v. Biggers*,

31 F.3d 279, 284 (5th Cir. 1994)).  This is because "[a]bsolute immunity is

---

[3]       Ray also alleges that the defendants violated Ray's "rights under the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, and the Fifth and Fourteenth Amendment Due Process Clauses" by "interfering with her ability to defend herself in state court." SAC ¶¶ 33-34.  Although the right of access to courts lies at the intersection of several constitutional protections, Ray's access-to-courts claim will be considered under the rubric of the Fourteenth Amendment for organizational purposes.  See *DeMarco v. Davis*, 914 F.3d 383, 387-88 (5th Cir.) ("Prisoners have a constitutionally protected right of access to the courts that is rooted in the Petition Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment.") (internal quotation marks omitted), *cert. denied*, __ U.S. __, 140 S. Ct. 250 (2019).

immunity from suit rather than simply a defense against liability, and is a threshold question 'to be resolved as early in the proceedings as possible.'" *Hulsey v. Owens*, 63 F.3d 354, 356 (5th Cir. 1995) (citations omitted).  Accordingly, the court assesses Recovery's claims of absolute immunity before turning to *Heck*.

### a.  Immunities

#### i.  *Absolute Immunity*

A "limited number" of actors enjoy absolute immunity from suit under § 1983. Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3573.3 (3d ed. 2008).  Absolute immunity from § 1983 actions is limited to actors "whose special functions require a full exemption from liability." *Butz v. Economou*, 438 U.S. 478, 508 (1978).  This "functional approach" assesses "the nature of the function performed, not the identity of the actor who performed it."[4] *Forrester v.*

---

[4]        In the context of § 1983, absolute immunity, when applicable, is most often granted to government officials.  And for good reason: § 1983 is actionable only against persons acting under color of state law.  However, "§ 1983 can *sometimes* impose liability upon a private individual." *Richardson v. McKnight*, 521 U.S. 399, 403 (1997) (emphasis in original).  Absolute immunity can and has been extended to such persons in some circumstances.  See *Briscoe v. LaHue*, 460 U.S. 325, 335-36 (1983) ("In short, the common law provided absolute immunity from subsequent damages liability for all persons – governmental or otherwise – who were integral parts of the judicial process.  It is equally clear that  § 1983 does not authorize a damages claim against private witnesses on the one hand, or against judges or prosecutors in the performance of their respective duties on the other.").  This conclusion follows from functional test established by the Supreme Court which stresses "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229 (1988).  Thus, an automatic denial of absolute immunity does not follow from the mere fact that Recovery is a nominally private party.

*White*, 484 U.S. 219, 229 (1988). In evaluating the relative protection that should be accorded to the actor's "functions," the court must engage in "a considered inquiry into the immunity historically accorded [to] the relevant [actor] at common law and the interests behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976). However, "[e]ven when [the court] can identify a common-law tradition of absolute immunity for a given function," § 1983's "history or purposes" may "nonetheless counsel against recognizing the same immunity in § 1983 actions." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal citations omitted). The Supreme Court has been "quite sparing" in recognizing absolute immunity and has "refused to extend it any further than its justification would warrant." *Burns v. Reed*, 500 U.S. 478, 487 (1991) (citations and internal quotation marks omitted). The actor "seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486.

Recovery argues that it is immune from any § 1983 suit arising out of Ray's positive alcohol report because the creation and transmission of the report was either (1) a "communication" made "during a judicial proceeding" that is protected by a "litigation privilege," (2) created pursuant to a "facially valid judicial order[ ]," or (3) protected as a "quasi-judicial" function. Recovery Motion to Dismiss at 6-9. None of these theories support an extension of absolute immunity to Recovery's creation and transmission of the positive alcohol report.

(1)  Litigation Privilege

Recovery's first theory of absolute immunity – that the report was protected by a "litigation privilege" – does not apply.  The primary case cited by Recovery supposedly supporting an absolute "litigation privilege" is inapposite to the instant suit.  Specifically, Recovery cites *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 992 (5th Cir. 1999), for the propositions that "[c]ommunications made by any party during a judicial proceeding cannot constitute the basis of a civil action, are not actionable, and are absolutely immune from civil liability." Recovery Response at 6 (internal quotation marks omitted).  In *Shanks*, an aircraft mechanic brought several state law tort claims, including defamation, against the manufacturer of an aircraft that crashed, claiming that the manufacturer provided false information to a National Transportation Safety Board ("NTSB") investigation, which ultimately concluded that the cause of the accident was improper maintenance.  *Shanks*, 169 F.3d at 990. The plaintiff argued that the defendants "contributed to an accident report that was false and misleading" and failed to "rectify errors in the NTSB's report."  *Id.*  The Fifth Circuit concluded that, under Texas law as predicted by the federal court, any communications made by the defendant during an NTSB investigation are absolutely privileged because such an investigation is a "quasi-judicial proceeding."  *Id.* at 993-95.

But *Shanks* is distinguishable in several important respects.  First, the Fifth

Circuit, sitting in diversity, was limited to a discussion of state law immunities and made an *Erie*-guess as to how the Texas Supreme Court would rule. *Id.* at 993. The *Shanks* court did not recognize a federal immunity for such communications. Rather, the issue in question was whether statements made by the aircraft manufacturer during an NTSB investigation were actionable under "state law causes of action" including defamation, negligence, and intentional infliction of emotional distress. *Id.* at 990-91. A state law immunity, though perhaps helpful in deriving an historical practice relevant to determining whether absolute immunity should be extended, is far from dispositive. *Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 375-76 (1990) (concluding that state law immunities have no force in § 1983 suits "over and above" those provided by § 1983 because "[t]he elements of, and the defenses to, a federal cause of action are defined by federal law"). This holds especially true where the Texas Supreme Court had not even definitively ruled on the immunity in question. Second and relatedly, even if the *Shanks* court recognized a federal immunity for such communications, such protections do not necessarily extend to a cause of action brought under § 1983. *Imbler*, 424 U.S. at 424 (assessing "whether the same considerations of public policy that underlie the common-law rule likewise countenance absolute immunity under" § 1983). Third, Recovery's creation and transmission of the report is not equivalent to the aircraft manufacturer's statements to the NTSB. For example, Recovery's monitoring of Ray's transdermal alcohol levels

- 15 -

occurred entirely outside any judicial proceeding and therefore is not a "communication" to a judicial proceeding.[5]  Thus, Recovery's first theory of absolute immunity fails.

(2)  Execution of a Valid Judicial Order

Recovery's second theory of absolute immunity – that Recovery was "executing [a] facially valid judicial order[ ]" – is similarly unavailing.  Recovery relies primarily on *Mays v. Sudderth*, 97 F.3d 107, 113 (5th Cir. 1996), for the proposition that "an official acting within the scope of his authority is absolutely immune from a suit for damages to the extent that the cause of action arises from his compliance with a facially valid judicial order issued by a court acting within its jurisdiction."

However, Recovery's reliance on *Mays* is misplaced for two reasons.  First, Recovery cannot come within the protections of *Mays* because Recovery fails to allege the existence of an order under which Recovery was operating the SCRAM device. True, the state court "ordered as a condition of community supervision that Ray 'participate in the SCRAM through Recovery Healthcare.'"  Recovery Motion to Dismiss at 8.  But by its own terms the order applied only to Ray, not Recovery. Unlike the order in *Mays*, the order at issue here did not direct Recovery to take any action.  Rather, the relationship between Recovery and the state court is contractual in nature, and Recovery admits as much.  In the paragraph immediately following

_____

[5]    For this same reason, the Supreme Court's decision in *Briscoe* is inapplicable.

Recovery's assertion that it was acting under court order, Recovery acknowledges that "[p]ursuant *to the contract with* [the Dallas County Community Supervision and Corrections Department ("DCCSCD")], Recovery" is responsible for certain actions related to the SCRAM device. *Id.* (emphasis added). Second, the *Mays* court recognized a significant limit to the immunity established in that case. Specifically, *Mays* did not purport to "address the liability of an officer whose conduct in executing a facially valid judicial order exceeds the scope of that order." *Id.* at 114. In assessing whether an officer exceeded the scope of the judicial order, a court must read the order narrowly. See *Hart v. O'Brien*, 127 F.3d 424, 440 (5th Cir. 1997) (denying absolute immunity to an assistant county attorney for participating in an unlawful search because the search warrant, by its terms, only extended to "the Sheriff or any Peace Officer"), *cert. denied*, 525 U.S. 1103 (1999). The Fifth Circuit has denied absolute immunity on the basis of this limit in several cases. See *In re Foust*, 310 F.3d 849 (5th Cir. 2002); *Hart,* 127 F.3d at 440. In *Foust*, for example, the Fifth Circuit refused to extend absolute immunity to a sheriff and his deputy after their seizure of the premises of a building rather than the "inventory" and "certain equipment and fixtures" specified by the court order. *In re Foust*, 310 F.3d at 855-56. The limit identified in *Mays* is likely applicable here. Specifically, Ray alleges that Recovery effectively lied to the state court by (1) presenting an allegedly incorrect alcohol report and (2) "knowingly deploy[ing] a product and service that

was *designed* to produce false allegations against probationers."  SAC ¶ 33 (emphasis in original).  Even if Recovery could point to a court order instructing Recovery to operate the SCRAM device during Ray's probation, the order would not extend to Recovery's alleged willful misrepresentations to the court or bad faith operation of the SCRAM device.  Accordingly, Recovery's second theory of absolute immunity fails.

### (3)  Quasi-Judicial Immunity

Finally, Recovery claims absolute protection from suit under "quasi-judicial immunity."  The Supreme Court and the Fifth Circuit have two different tests in determining whether an actor should be accorded absolute immunity.  On one hand, quasi-judicial immunity is extended to "[o]fficials whose responsibilities are 'functionally comparable' to those of a judge."  *Johnson v. Kegans*, 870 F.2d 992, 995 (5th Cir.) (quoting *Butz*, 438 U.S. at 513), *cert. denied*, 492 U.S. 921 (1989).  Key to this test is whether the actor in question is performing "adjudicative" functions.  *Beck v. Texas State Board of Dental Examiners*, 204 F.3d 629, 635-36 (5th Cir.), *cert. denied*, 531 U.S. 871 (2000).  "Thus, for example, federal hearing examiners and administrative law judges, arbitrators, bar association disciplinary committee members, the National Association of Securities Dealers, Inc. and its disciplinary officers, and members of pardon and parole boards have been held absolutely immune from suit because they perform adjudicatory roles which are functionally

substantially equivalent to those of judges." *Johnson*, 870 F.2d at 995 (citations omitted).

On the other hand, quasi-judicial immunity has also been extended to actors who are "intimately associated with the judicial phase of the criminal process." *Id.* at 996. According to the Fifth Circuit, quasi-judicial immunity extends to prosecutors, witnesses, and grand jurors on the basis of their close association "with the judicial phase of the criminal process." *Id.* The functions of probation officers have been assessed by courts in this circuit under both tests. Compare *Spaulding v. Nielsen*, 599 F.2d 728, 729 (5th Cir. 1979) (holding that "a probation officer is entitled to the same protection [as prosecutors] when preparing and submitting a presentence report in a criminal case") and *Galvan v. Garmon*, 710 F.2d 214, 215 (5th Cir. 1983) (declining to extend absolute immunity to a probation officer who incorrectly revoked the plaintiff's probation because the probation officer "acted at her own initiative and at a different phase of the criminal process less intimately associated with the judiciary"), *cert. denied*, 466 U.S. 949 (1984), with *Arnone v. Syed*, 3:17-CV-03027-E, 2020 WL 2085594 at *5-*6 (N.D. Tex. Apr. 30, 2020) (Brown, J.) (declining to extend absolute immunity to a probation officer's administration of a polygraph test and reporting of the results because the functions were not adjudicatory in nature).

Recovery occupies an awkward place in this schema and does not fit neatly

into any preexisting niche.  Accordingly, the court assesses Recovery's functions

under both tests.

### (A)  Adjudicative Function

"When judicial immunity is extended to officials other than judges, it is

because their judgments are 'functional[ly] comparab[le] to those of judges – that is,

because they, too, 'exercise a discretionary judgment' as a part of their function."

*Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993) (quoting *Imbler*, 424 U.S.

at 423).  The "adjudicative function" test does not turn on whether the task is

difficult or even "essential to the very functioning of courts."  *Id.* at 436-37.  Rather,

"the 'touchstone' for the doctrine's applicability has been 'performance of the

function of resolving disputes between parties, or of authoritatively adjudicating

private rights.'"  *Id.* at 435-36 (quoting *Burns*, 500 U.S. at 500).[6]

As applied to the instant suit, Recovery quite clearly did not perform functions

substantially comparable to that of a judge when it created and transmitted the

positive alcohol report.  At its core, Recovery's sole function was the identification

---

[6]     In the context of a federal administrative agency's adjudicative process,
the Fifth Circuit has identified six factors to be considered: "(1) the need to assure
that the individual can perform his functions without harassment or intimidation; (2)
the presence of safeguards that reduce the need for private damages actions as a
means of controlling unconstitutional conduct (3) insulation from political influence;
(4) the importance of precedent; (5) the adversary nature of the process; and (6) the
correctability of error on appeal."  *Beck*, 204 F.3d at 634 (citing *Butz*, 438 U.S. at
512).  Although no administrative process is at issue here, the factors and interests
identified in *Butz* are instructive in illuminating the type of adjudicatory process that
the Fifth Circuit considers worthy of absolute immunity.

and reporting of an alleged probation violation; in essence, a signaling function. Recovery "adjudicated" no disputes and passed no judgment affecting private rights in any meaningful sense. Recovery oversaw no proceedings which could even remotely be described as "adjudicatory in nature." No "dispute" even existed at the time of the creation and transmission of the alcohol report. *Antoine*, 508 U.S. at 435-36. Furthermore, Recovery's contractual obligations to the DCCSCD provide for no discretionary powers comparable to a judge or parole board. At most, Recovery played the purely ministerial role of recording alcohol levels and transmitting any positive report to the state court.

Of course, one could argue that the design and use of a complex algorithm for deriving blood-alcohol levels from transdermal alcoholic vapors (and the interpretation of data-collection results, which includes the ability to differentiate between environmental and consumed alcohol) necessarily requires a certain degree of discretion and judgment.[7] But designing and operating the SCRAM device is fundamentally a scientific and technical enterprise, not an adjudicatory one: a positive alcohol finding is not necessarily equivalent to a finding that Ray violated the terms of her probation. Accordingly, Recovery did not engage in a function that was substantially equivalent to that of a judge and cannot avail itself of absolute

---

[7]     Indeed, according to Ray, "medical, scientific, or engineering qualifications" are necessary to accurately "distinguish a false positive from true alcohol consumption." SAC ¶ 22.

immunity under this test.

### (B)  Intimately Related to the Judicial Phase of the Criminal Process

The Supreme Court has held that actors performing functions which are "intimately associated with the judicial phase of the criminal process" are absolutely immune from suit under § 1983.  *Imbler*, 424 U.S. at 430.  The quintessential act covered by this immunity is a prosecutor's "decision to initiate a prosecution."[8]  *Id.* at 421.  However, not all functions performed by actors who share a close relationship with the judicial system are protected.  For example, the Supreme Court has drawn a distinction between "a prosecutor's acts in preparing for [initiating and presenting the State's case], some of which would be absolutely immune, and [the prosecutor's] acts of investigation or 'administration,' which would not."  *Buckley*, 509 U.S. at 270 (citations omitted).  Such administrative or investigative functions include "functions normally performed by a detective or police officer," such as "plan[ning] and execut[ing] a raid on a suspected weapons cache."  *Id.* at 273-74 (citations omitted).

Recovery's functions in creating and transmitting the positive alcohol report to

---

[8]      Similarly, absolute immunity shields the prosecutor from any suit predicated on the prosecutor's participation in the courtroom setting because such a function involves the prosecutor's "role as an advocate for the State."  *Burns*, 500 U.S. at 491 (citations omitted).  Of course, the rationales of *Imbler* and *Burns* extend to protect some "actions preliminary to the initiation of a prosecution and actions apart from the courtroom," such as an out-of-court "effort to control the presentation of [a] witness' testimony."  *Imbler*, 424 U.S. at 430 n.32, 33.  But such extensions are narrow.

the state court are not so intimately related to the judicial phase of the criminal process so as to warrant absolute immunity.  As noted above, Recovery's sole responsibility vis-a-vis the criminal justice system is to record and report alcohol levels.  Recovery's contractual duties with the DCCSCD do not resemble the absolutely protected functions of a prosecutor in any respect.[9]  Unlike a prosecutor's initiation of a prosecution, preparation of a witness, or courtroom conduct, Recovery's functions do not "necessarily require legal knowledge and the exercise of related discretion," *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009).  Additionally, Recovery's activities occurred only after the initial case against Ray had effectively closed.  At most, Recovery performed back-end, mechanical administrative or investigative functions, neither of which warrant a grant of absolute immunity.  The responsibility of determining whether a probationer ingested alcohol is a far cry from "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury."  *Buckley*, 509 U.S. at 273.  Indeed, monitoring and reporting probation violations are quintessential investigatory or law enforcement duties, rather than prosecutorial ones.  Furthermore, the mere fact that the positive alcohol report was a crucial – even the

---

[9]     Although it is true that Recovery participated in the revocation hearing when it "insisted that Static Guard could not be the source of the alcohol reading," SAC ¶ 17, it did not "initiate" a prosecution or otherwise represent the State.  Rather, Recovery acted in that limited instance as more akin to an expert witness than it did an "advocate of the State."  *Burns*, 500 U.S. at 491.

exclusive – piece of information relied on by the state prosecutors in bringing the motion to revoke does not change the fundamental nature of the activities performed by Recovery.  See *id.* at 275-76 ("That the prosecutors later called a grand jury to consider the evidence [that the prosecutor's administrative] work produced does not retroactively transform that work from the administrative into the prosecutorial.  A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . .").  Recovery therefore cannot avail itself of absolute immunity under the line of cases extending such protections to prosecutors.

Nor does Recovery's recording and reporting activities resemble the limited set of absolutely protected functions performed by probation officers.  The Fifth Circuit has held that some functions of probation officers are totally protected but has declined to extend absolute immunity to other functions.  In *Spaulding*, absolute immunity was extended to a federal probation officer's preparation and submission of a presentence report because such a report was "an integral part of the sentencing process, and in preparing the report the probation officer acts at the direction of the court."  599 F.2d at 729.  In *Galvan*, on the other hand, the Fifth Circuit declined to extend absolute immunity to a federal probation officer "who mistakenly cause[d] the arrest and incarceration of a person on probation" when the probation officer

"noticed [the probationer's] name on the jail roster," incorrectly assumed "that the person in jail was [the probationer]," and ultimately caused the arrest and detention of the probationer. 710 F.2d at 214. The court in *Galvan* placed great weight on the fact that "the probation officer acted at her own initiative and at a different phase of the criminal process less intimately associated with the judiciary" than the probation officer in *Spaulding*. *Id.* at 215.

Recovery's activities in measuring and transmitting a probationer's alcohol levels is distinguishable from preparing and submitting a presentence in several respects. First, whereas a presentence report generated by a probation officer occurs during, and represents an important part of, the judicial phase of the criminal process, the recording and reporting functions of Recovery occur only after most or all essentially judicial decisions are made. This is not, of course, to say that once a judge sentences a defendant, no judicial or quasi-judicial functions worthy of absolute immunity remain. It is nonetheless true, however, that functions proximate to core judicial and prosecutorial decision-making warrant special protections over and above those that occur much later in the process. See *Galvan*, 710 F.2d at 215 (noting that probation officer's act of reviewing jail roster occurred "at a different phase of the criminal process less intimately associated with the judiciary"). Second, a presentence report is prepared "at the direction of the court," *Spaulding*, 599 F.2d 729, where the probation officer serves "essentially 'as an arm of the sentencing

judge.'" *Cleavinger v. Saxner*, 474 U.S. 193, 204 (1985) (quoting *Sellars v. Procunier*, 641 F.2d 1295, 1302 n.15 (9th Cir.), *cert. denied*, 454 U.S. 1102 (1981)).  Although Recovery is contractually obligated to monitor the SCRAM device, such conduct is almost entirely independent of "the sentencing judge."  Indeed, it appears that Recovery has no formal relationship with any particular state judge, and is instead obligated to bring any positive alcohol reports to the attention of state probation officials, not directly to the state court or even to state prosecutors.  *See* SAC ¶ 16 (noting that Recovery "sent [the positive alcohol] report to Dallas County probation officials").  Unlike a probation officer preparing a presentence report, therefore, Recovery cannot be said to be an "arm" of any state judge.  Accordingly, Recovery has not demonstrated that it is entitled to absolute immunity under either test.[10]

------

[10]        The court is further aided in its decision to deny absolute immunity for two reasons.  First, Recovery points to no tradition of extending absolute immunity to actors performing functions equivalent to those performed by Recovery, and the court is aware of no such tradition.  *Imbler*, 424 U.S. at 421 (noting that immunity decisions are "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and interests behind it").  Second, the alleged constitutional abuses committed by Recovery could continue unchecked without a civil remedy under § 1983 because Recovery's activities lack important safeguards.  See *Beck*, 204 F.3d at 635 (noting the importance of ensuring "the presence of adequate safeguards").  In extending absolute immunity to federal administrative judges sued under *Bivens*, the Supreme Court stressed that "the safeguards built into the judicial process tend to reduce the need for private damages action as a means of controlling unconstitutional conduct," even in the administrative context.  *Butz*, 438 U.S. at 512.  Specifically "[t]he insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges."  *Id.*  Additionally, "[a]dvocates are restrained not only by their professional obligations, but by the

ii.  *Qualified Immunity*

Unlike absolute immunity, "[q]ualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).  "Generally, under Rule 8(c) affirmative defenses must be raised in the first responsive pleading." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009).  Neither Recovery nor AMS raised qualified immunity as a defense in any operative or non-operative responsive

_____

knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias.  Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury." *Id.* None of these safeguards are built into the monitoring and reporting conducted by Recovery.  True, any positive alcohol report generated by Recovery and relied on by state prosecutors must pass through the rigors of the judicial process before serving as the basis for revocation or other punishment.  But the protections afforded by the judicial process at the revocation stage cannot remedy any constitutional harms perpetrated by Recovery during its recording and reporting activities.  Furthermore, the highly technical algorithms which form the heart of Recovery's reports do not lend themselves to critical review through the evaluative techniques available to the average civil litigant.  Ray's experience during the pendency of the motion to revoke her probation is instructive on this point.  The motion to revoke was dropped only after Semenoff's expert report – for which Semenoff "waive[d] her normal expert fee," SAC ¶ 18 – allegedly demonstrated that the December 25th positive alcohol report "clearly follow[ed] the pattern of alcohol *evaporation* rather than alcohol *metabolism*," *id.* at Exhibit A, 6-7 (emphasis original) and was provided to state prosecutors. *Id.* ¶ 18. Thus, even if it is assumed that a civil litigant has access to expert testimony capable of challenging the scientific and technical basis of Recovery's report, the judicial process may be unavailing because prosecutors may ultimately drop a motion to revoke or decline to bring one altogether.  See *Burns*, 500 U.S. at 496 ("[O]ne of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police.  This is particularly true if a suspect is not eventually prosecuted.  In those circumstances, the prosecutor's action is not subjected to the 'crucible of the judicial process.'") (citations omitted).

pleading.[11]  According, the court need not consider whether either of the defendants are entitled to qualified immunity.

### b. *Heck*

Now that the issues of immunity have been resolved, the court turns to the question whether Ray's § 1983 claims are barred as unripe under *Heck*.  In *Heck*, the Supreme Court established that, before ruling on a § 1983 claim, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."[12]  512 U.S. at 487.  If such a judgment in favor of the plaintiff violates *Heck*, the action should be dismissed without prejudice as unripe. *Jackson v. Vannoy*, 49 F.3d 175, 177 (5th Cir.), *cert. denied*, 516 U.S. 851 (1995). However, "if the district court determines that the plaintiff's action, even if

---

[11]    Indeed, Recovery made clear that it was not asserting a qualified immunity defense in its reply to Ray's nonoperative first amended complaint. Defendant Recovery Healthcare Corporation's Reply in Support of its Motion to Dismiss (docket entry 26) at 5 n.20 ("Recovery Healthcare did not cite *Filarsky*[ *v. Delia*, 566 U.S. 377 (2012)] to apply qualified immunity here.  Rather, *Filarsky* [and other cases] cited in the motion stand for the proposition that this Court should look not to Recovery Healthcare's identity but to its function in the context of Ray's proceeding.").

[12]    A conviction or sentence is "invalidated" when it "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 487.

successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed . . . ."  *Heck*, 512 U.S. at 487 (emphasis in original).

Both defendants argue that Ray's § 1983 claims are barred under *Heck* because a judgment in favor of Ray would necessarily invalidate the 12-step recovery program. AMS Motion to Dismiss at 14.  Ray counters that neither the motion to revoke nor the 12-step recovery program constitute a "conviction or sentence."  Response to Recovery at 2-4.  The court agrees with the defendants that the 12-step recovery program is a "conviction or sentence" and that a judgment in favor of Ray would necessarily invalidate such a conviction or sentence.  As Ray has not shown that the 12-step recovery program has been invalidated, Ray's § 1983 claim is barred as unripe under *Heck*.

*i. Conviction or Sentence*

The Fifth Circuit has not outlined a definitive test to determine whether a particular judicial action constitutes a "conviction or sentence" for purposes of *Heck*. However, the Fifth Circuit has held that "deferred adjudication," including probation, should be considered such a "conviction or sentence."  *DeLeon v. Collins*, 488 F.3d 649 (5th Cir. 2007).  In so concluding, the *DeLeon* court first considered Texas state law.  *Id.* at 653-54.  The Fifth Circuit found that Texas law did not support a holding that deferred adjudication constituted a "conviction or sentence" because state courts

- 29 -

have held that "any probation following an order of deferred adjudication is not a sentence," *id.* at 653 (citing *Ex parte Shillings*, 641 S.W.2d 538, 539 (Tex. Cr. App. 1982)), and "that when adjudication is deferred, 'there can be no imposition or suspension of sentence because no punishment is assessed,'" *id.* (quoting *Hammack v. State*, 963 S.W.2d 199, 200 (Tex. App. – Austin 1998)).  The *DeLeon* court, "look[ing] beyond the 'sentence or conviction' language in *Heck,*" then considered whether, "viewing [deferred adjudication] as a final judicial act," the policy goals of *Heck* would be undermined if deferred adjudication was not considered a "conviction or sentence."  *DeLeon*, 488 F.3d at 654-56 & n.33.  Under this rubric, the Fifth Circuit found that "although the Texas courts have in all circumstances held that [deferred adjudication] orders are not convictions, they have been accorded finality, for instance in the appellate context, where the defendant is released on bail pending the disposition of his appeal of his deferred adjudication order, which does not become final until the appellate court's mandate issues."  *Id.*  On this basis, the *DeLeon* court concluded that "a deferred adjudication order is a conviction" under *Heck*.  *Id.*

The key issue here is whether a meaningful distinction can be drawn between the initial decision by the state court to impose probation – which was held in *DeLeon* to be a "conviction or sentence" for purposes of *Heck* – and a modification of probation in the form of additional conditions (*e.g.*, a 12-step program). The court

sees no reason to depart from the path blazed by *DeLeon* and concludes that the modification of probation terms is a "conviction or sentence." The court first considers the imposition of the 12-step program before turning to state prosecutors' motion to revoke Ray's probation.

### (1) 12-Step Program

To begin, the 12-step program imposed by the state court as a result of Ray's alleged consumption of alcohol in violation of her conditions of probation is not a "sentence or conviction" under Texas law. Under state law, "[t]he granting of a probation creates a contractual relationship between the court and the probationer." *Bowen v. State*, 649 S.W.2d 384, 386 (Tex. App. – Fort Worth 1983, pet. ref'd). Accordingly, "[p]robation revocation hearings are not criminal trials." *Id.* Rather, "[t]hey are administrative proceedings, supervised by the court, [that are] adversarial in nature . . . ." *Id.* "At such a proceeding, guilt or innocence is not at issue, and the trial court is not concerned with determining the defendant's original criminal culpability." *Davenport v. State*, 574 S.W.2d 73, 75 (Tex. Crim. App. 1978).[13]

---

[13] Texas state law places "probation" under the more general rubric of "community supervision," which is defined in relevant part as "the placement of a defendant by a court under a continuum of programs and sanctions, with conditions imposed by the court for a specified period during which: (A) criminal proceedings are deferred without an adjudication of guilt; or (B) a sentence of imprisonment or confinement, imprisonment and fine, or confinement and fine, is probated and the imposition of sentence is suspended in whole or in part." TEX. CRIM. PROC. Art. 42A.001; see also *Speth v. State*, 6 S.W.3d 530, 532 n.3 (Tex. Crim. App. 1999) ("Probation is referred to in the Code of Criminal Procedure as 'community supervision.'").

In the instant case, it appears that the state court modified Ray's probation as a result of Ray's alleged alcohol consumption by requiring her to attend the 12-step program.  See TEX. CRIM. PROC. Art. 42A.751(d).  There is plainly no "conviction" because the state court did not produce a judgment stemming from Ray's alleged alcohol consumption in violation of her probation terms.  See *Davenport*, 574 S.W.2d at 75 ("[T]he result of such a hearing to revoke is not a Conviction but a finding upon which the trial court might exercise its discretion by revoking or continuing probation.") (citation omitted).  Rather, the 12-step program runs parallel to the imposition of probation in *DeLeon*.  In both cases, "there is an order, but no judgment, a term defined in Texas as 'the written declaration of the court signed by the trial judge and entered of record showing the conviction or acquittal of the defendant.'" *DeLeon* 488 F.3d at 653 (citing TEX. CRIM. PROC. Art 42.01).  The 12-step program is merely a modification of the original decision to defer adjudication or probate the imposition of the sentence.[14]

Nor does the 12-step program constitute a "sentence" under Texas law, which is defined as essentially an appendage to the judgment.  See TEX. CRIM. PROC. Art 42.02 ("The sentence is that part of the judgment, or order revoking a suspension of

---

[14]    Article 42A.752 of the Texas Code of Criminal Procedure provides that a "[if] after a hearing . . . a judge continues or modifies community supervision after determining that the defendant violated a condition of community supervision, the judge may impose any other conditions the judge determines are appropriate . . . ." TEX. CRIM. PROC. Art 42A.752(a).

the imposition of a sentence, that orders that the punishment be carried into execution in the manner prescribed by law."). As stated above, the state court in this case rendered no "judgment" as a result of the 12-step program and issued no "order revoking a suspension of" a sentence.[15] Furthermore, a criminal defendant under Texas law is not, properly speaking, "sentenced" to probation. See *Ex parte Cruthirds*, 712 S.W.2d 749, 752-53 (Tex. Crim. App. 1986) (holding that appellant, who was placed on probation, was not serving a "sentence" for purposes of good-time credits because, "under the statutory definition of probation, imposition of sentence is suspended"). As the Texas Court of Criminal Appeals succinctly stated: "community supervision is an arrangement *in lieu of* the sentence, *not as part of* the sentence." *Speth*, 6 S.W.3d at 532 (emphasis in original). Although Ray was "convicted" of driving while intoxicated, SAC ¶ 15, Ray's sentence was "suspended" as a result of her placement on probation. Thus, Texas law does not support the conclusion that

_____

[15]     The Supreme Court's decision in *Edwards v. Balisok*, 520 U.S. 641 (1997), is inapposite. In that case, the Supreme Court applied *Heck* to a prison disciplinary hearing that resulted in the loss of good-time credits earned by the defendant. *Id.* at 645-46. Although no "conviction or sentence" was independently rendered by the prison disciplinary body, *Heck* controlled because a criminal sentence of imprisonment was already imposed, and the plaintiff's challenge to his loss of good time credits was functionally equivalent to challenging the length or fact of the original sentence. *DeLeon*, 488 F.3d at 654 ("[A] prisoner cannot circumvent well-established procedures for challenging his sentence of confinement, whether attacking the judgment imposing the sentence or the administrative ruling declining to shorten it."). Such facts are distinguishable than the ones at bar.

the 12-step program is a "sentence or conviction."[16]

As in *DeLeon*, however, viewing a modification of probation terms as "a final judicial act" reveals that the practical purposes of *Heck* would be undermined if this court were to conclude that the 12-step program is not a "conviction or sentence." The Fifth Circuit in *DeLeon* placed great weight on two factors in concluding that the imposition of probation was a "sentence or conviction."   First, the imposition of probation has been "accorded finality, for instance, in the appellate context, where the defendant is released on bail pending the disposition of his appeal of a deferred adjudication order, which does not become final until the appellate court's mandate

---

[16]      In *Mason v. State*, 598 S.W.3d 755 (Tex. App. – Fort Worth 2020, pet. filed), the Texas Court of Appeals concluded that "a person who has been convicted by a federal court and thereafter released from confinement to supervised release has [not] fully discharged his or her" "sentence" for purposes of state election law. *Id.* at 771. *Mason* is not contrary to the conclusion reached by this court on the nature of probation for three reasons.  First, as in *Balisok*, a federal court already rendered a judgment and sentence of imprisonment on the plaintiff and her post-imprisonment supervised release functioned as an appendage of that sentence. *Id.* at 773.  Only after the plaintiff's release was she subjected to supervised release.  Such a circumstance is inapposite to a freestanding imposition of probation, as in *DeLeon*, or additional probationary conditions resulting from a modification by a state court, as in the instant case.  Second, the *Mason* court considered only whether post-imprisonment supervised release constituted part of a *federal* sentence, not a state sentence.  The nature of federal and state sentences could admit of a distinction in this regard.  Third, *Mason* assessed whether post-imprisonment supervised release should be considered part of a "sentence" for the narrow purpose of determining whether the plaintiff violated the state's election law which, as a result of its wording, is not reflective of the general treatment of probation under Texas law.  *Id.* at 772-73 (distinguishing the definition of "supervision" under Article 42A from that used in the state election law).

issues."[17] *DeLeon*, 488 F.3d at 655-56.  Second, "although there is no finding of guilt, there is at least a judicial finding that the evidence substantiates the defendant's guilt, followed by conditions of probation that may include a fine and incarceration." *Id.* at 656.

Both concerns exist in the context of probation modification.  First, an order modifying the terms of probation carries the essential qualities of finality.  Texas law empowers state courts to "determine the conditions of community supervision after considering the results of a risk and needs assessment" and "may impose any reasonable condition . . . that is designed to protect or restore the community, protect or restore the victim, or punish, rehabilitate, or reform the defendant."  TEX. CRIM. PROC. Art. 42A.301(a).  This power includes a state court's ability to "modify community supervision after determining that the defendant violated a condition of community supervision."  TEX. CRIM. PROC. Art 42A.752.  True, Texas courts have held that a trial court's modification of probationary terms is usually "not final" for purposes of appellate jurisdiction.  *Bailey v. State*, 160 S.W.3d 11, 13 (Tex. Crim. App. 2004).  But such orders are frequently appealed in certain circumstances.  See *Elizondo v. State*, 966 S.W.2d 671, 672 (Tex. App. – San Antonio 1998, no pet.) (examining several cases which "illustrate that a probationer may complain of a

---

[17]       Indeed, the Supreme Court's decision in *Heck* is grounded in "concerns for finality and consistency" which would be threatened by "opportunities for collateral attack."  *Heck*, 512 U.S. at 484-85.

modification order when violation of that order formed the basis of a subsequent revocation"). Furthermore, finality for purposes of appeal is but one criterion in assessing whether a judicial act is "final."[18] Any ordinary use of the term "final" would include the state court's modification of Ray's probation. See *Final*, BLACK'S LAW DICTIONARY (10th ed. 2009) ("[N]ot requiring any further judicial action beyond supervising how the decree is carried out."). The requirement that Ray attend the 12-step program is "final" in the sense that it was wholly within the state court's discretionary power, could not be appealed, and otherwise effectively left Ray no other option than to comply.[19]

Second, as in *DeLeon*, although no finding of "guilt" was made, state courts are required to make certain "findings" during probation revocation hearings, including that the probationer violated the terms of his probation. Texas state law provides that a judge must hold a hearing before revoking or modifying the terms of probation. TEX. CRIM. PROC. Art 42A.752(a). "[I]n every case the findings and conclusions upon which the trial court acts should be clearly set forth in the order of revocation."

_____

[18]     The Fifth Circuit's non-exclusive language in *DeLeon* supports this conclusion. See *Deleon*, 488 F.3d at 655 ("[A]lthough the Texas courts have in all circumstances held that [orders imposing probation] are not convictions, they have been accorded finality, *for instance* in the appellate context . . . .") (emphasis added).

[19]     Ray argues that, because "the motion to revoke was . . . withdrawn by prosecutors," there could have been no "conviction." Response to Recovery at 3 n.1. On this basis, Ray describes the 12-step program as an "interim order." *Id.* "Interim order" or otherwise, the 12-step program is a "sentence or conviction" under *Heck* for the reasons stated herein.

*Gamble v. State*, 484 S.W.2d 713, 715-16 (Tex. Crim. App. 1972). During a revocation hearing, the judge considers "the legal sufficiency of the evidence" and assesses "the credibility of the witnesses and the weight to be given their testimony." *Edwards v. State*, 54 S.W.3d 834, 835 (Tex. App. – Fort Worth 2001, pet. ref'd). Any order revoking or modifying probation must be supported by a preponderance of the evidence. *Rickels v. State*, 202 S.W.3d 759, 763-64 (Tex. Crim. App. 2006).

Probation revocation hearings also carry the indicia of criminal proceedings. For example, as in traditional criminal proceedings, "the Rules of Criminal Evidence are generally applicable to a revocation hearing," *Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993), and the defendant is entitled to "fair notice of the allegations against him so that he can prepare a defense." *Spruill v. State*, 382 S.W.3d 518, 520 (Tex. App. – Austin 2012, no writ). "Indeed, aside from the burden of proof required to prove a community-supervision violation . . ., there are few procedural differences between a Texas criminal trial and a Texas community-supervision revocation proceeding." *Ex parte Doan*, 369 S.W.3d 205, 210 (Tex. Crim. App. 2012). The limitations on Ray's liberties through her compelled attendance at the 12-step program is also akin to what is traditionally viewed as a "sentence" and the modification of her probation occurred in conjunction with her DWI conviction. Accordingly, the modification of probationary terms to include additional conditions, such as the instant 12-step program, implicate the interests identified in *DeLeon* and

is, therefore, a "sentence or conviction."[20]

### (2) Motion to Revoke

Ray also argues that the "interim step[s]" engaged in by state prosecutors and the state court – such as moving to revoke Ray's probation or issuing an arrest warrant – are not convictions or sentences under *Heck*.  Response to AMS at 10.  Ray is, of course, correct that such "interim step[s]" are not convictions or sentences. Nevertheless, *Heck* still applies to such preliminary conduct for two reasons.  First, merely because a plaintiff can point to one aspect of her criminal proceedings as something other than a "conviction or sentence" does not mean that no sentence or conviction was ultimately rendered.  A *Heck* inquiry asks only whether a "conviction or sentence" has been imposed and is wholly unconcerned with any criminal proceedings leading up to that conviction or sentence.  Holding otherwise would effectively nullify the entire doctrine because every criminal proceeding that results in a conviction or sentence necessarily entails pre-conviction and pre-sentencing procedures.  The Supreme Court's *Heck* jurisprudence is surely not so myopic. Second, even if the court were to don the artificial blinders advanced by Ray, both

---

[20]    The court also notes that a contrary holding would create an senseless formality under which a plaintiff is denied the right to sue for conduct leading to the initial imposition of probation but is allowed to sue for conduct leading to any subsequent modification.  Conferring the right to sue for the conduct at bar would have functionally the same result in both circumstances: a federal damages action could challenge state judicial findings and orders which form a crucial element of the state criminal justice system.

the "interim step[s]" and the 12-step program were predicated on the same piece of evidence (*i.e.*, the positive alcohol report). As such, the consequences of invalidating the positive alcohol report for purposes of the "interim step[s]" would necessarily extend to the 12-step program as well.

### ii.  *Necessary Invalidation*

The next step is to "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S. at 487. In determining whether a conviction or sentence would be impliedly invalidated by a judgment in favor of the plaintiff, federal courts look to state law. *Vannoy*, 49 F.3d at 177 n.6.

The contours of probationers' procedural and constitutional rights during revocation hearings are, briefly, as follows. The Texas Rules of Evidence are applicable to probation revocation proceedings. Tex. R. Evid. 101(e); see also *Doan*, 369 S.W.3d at 210. Additionally, "the exclusionary rule [barring] illegally seized evidence appl[ies] fully in a Texas probation revocation hearing." *Doan*, 369 S.W.3d at 210. "The Due Process Clause of the Fourteenth Amendment [also] imposes procedural and substantive limits on the revocation of the conditional liberty created by probation." *Ex parte Carmona*, 185 S.W.3d 492, 495 (Tex. Crim. App. 2006). Probationers are afforded full Fifth Amendment protections. *Chapman v. State*, 115 S.W.3d 1, 5-6 (Tex. Crim. App. 2003).

- 39 -

A conclusion by this court that Recovery or AMS violated Ray's Fourth, Fifth, or Fourteenth Amendment rights would necessarily imply the invalidity of the 12-step program because any finding by the state trial court that Ray violated the terms of her probation would be premised on unconstitutionally obtained or considered evidence.  Texas courts have consistently invalidated the results of probation revocation hearings where a probationer's Fourth, Fifth, or Fourteenth Amendment rights were violated.  See *Wiede v. State*, 157 S.W.3d 87 (Tex. App. – Austin 2005, pet. ref'd).  This conclusion is compounded by the fact that the sole piece of evidence before the state court during the revocation hearing was the positive alcohol report.  Accordingly, any constitutional defect inherent in the production or consideration of the report would render invalid any subsequent decision made on its basis.[21]  Nor would the positive alcohol report have been cured from constitutional defect under the inevitable discovery or independent source doctrines.  See *Heck*, 512 U.S. at 487 n.7.

As a judgment in favor of Ray would necessarily imply the invalidity of the 12-step program, *Heck* bars Ray's § 1983 claims unless she demonstrates "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . ., or called into question by a federal

---

[21]     There is every reason to expect that a violation of Ray's right of access to the courts, *see* n. 3 above, would meet the same result.  See *In re Bonilla*, 424 S.W.3d 528, 532-33 (Tex. Crim. App. 2014).

court's issuance of a writ of habeas corpus." *Id.* at 486-87.  Ray has made no such

showing.  Accordingly, Ray's civil rights claims are barred as unripe under *Heck*.

### 2. RICO Claims

Ray brings racketeering claims against Recovery under 18 U.S.C. § 1964.  SAC

¶ 36.  Subsection (c) of that statute provides a cause of action to "[a]ny person

injured in his business or property by reason of a violation of section 1962 of this

chapter . . . ." § 1964(c).  Section 1962, in turn, outlaws certain types of conduct

enumerated and described under four subsections.  *See* § 1962(a)-(d).  "Under all

those subsections, to state a RICO claim, there must be: '(1) a *person* who engages in

(2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment,

conduct, or control of *an enterprise*.'"  *St. Paul Mercury Insurance Company v.

Williamson*, 224 F.3d 425, 439 (5th Cir. 2000) (emphasis in original).  These

threshold elements must be satisfied before a court turns "to the substantive

requirements of each respective subsection." *Id.*  If, as here, the predicate acts of a

RICO claim involve allegations of fraud, a plaintiff must satisfy "Rule 9(b)'s

heightened pleading standard, under which plaintiffs 'must state with particularity

the circumstances' of the allegedly fraudulent conduct." *Molina-Aranda v. Black Magic

Enterprises, L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020) (citations omitted).  The

plaintiff must describe the "who, what, when, and where" supporting her allegations

of fraud. *Id.* (citations omitted).

A "person" is the defendant in a RICO action and must be alleged to have committed racketeering acts. See *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995) ("The RICO person in a civil or criminal RICO action is the defendant") (citations omitted).  For purposes of the RICO statute, a "person" is defined broadly as "any individual or entity capable of holding a legal or beneficial interest in property." § 1961(3).  However, the Fifth Circuit has further restricted the definition of "person" to "one that either poses or has posed a continuous threat of engaging in acts of racketeering."  *Delta Truck & Tractor, Inc. v.  J.I. Case Company*, 855 F.2d 241, 242 (5th Cir. 1988), *cert. denied*, 484 U.S. 1079 (1989).  Although "pleading the existence of a 'pattern of racketeering activity' will supply this element of continuity to the RICO person" in most cases, the continuity requirement "may not be satisfied if no more is pled than that the person has engaged in a limited number of predicate racketeering acts."  *Id.*

Ray has failed, at a minimum, to allege (1) that Recovery engaged in a "pattern of racketeering activity," or (2) even if Recovery engaged in such activity, that Recovery is a "person" under the Fifth Circuit's continuity test.  The fundamental flaw in Ray's complaint is that Ray fails to plead almost any non-conclusory allegations that Recovery – as opposed to and distinct from AMS – engaged in fraudulent conduct for the purposes of identifying a "pattern of racketeering activity." Indeed, Ray appears to confuse her burden under the RICO statute to demonstrate

that the "person" – here, Recovery – committed the racketeering activities as distinct from the "enterprise" – here, AMS.[22]  *See* SAC ¶ 37 (describing the practices of AMS in violating the mail and wire fraud statues); see also *In re Burzynski*, 989 F.2d at 743 (noting that, for most purposes, a RICO person "must be distinct from the RICO 'enterprise'").

Ray's complaint is inadequate under the heightened Rule 9(b) pleading standard in at least three respects.  First, Ray fails to divorce Recovery's activities from those of AMS.  For example, Ray alleges that "AMS and Recovery Healthcare advertise to the public and to government agencies that the SCRAM device is capable of" differentiating between ingested and environmental alcohol despite knowing "that the claim is false."  SAC ¶ 13.  Ray's intermixing of Recovery's and AMS' allegedly fraudulent activities occurs throughout the complaint.  *See, e.g.,* ¶¶ 16-17, 19, 26, 28, 34.  This pleading tactic violates Rule 9(b)'s particularity standard because such allegations are non-referable to any particular defendant.  See *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corporation*, 125 F.3d 899, 903 (5th Cir. 1997).  Second, even if Ray separated-out Recovery's activities from those of AMS, Ray fails to allege "the who, what, when, and where," of Recovery's alleged fraud.  *Molina-Aranda* 983

---

[22]    Of course, under certain theories of RICO liability, "the 'enterprise' and the 'person' can be one and the same."  *In re Burzynski*, 989 F.2d 733, 743 (5th Cir. 1993).  However, this limited exception does not appear to apply because Ray brings her RICO claim against Recovery alone, not AMS, and Recovery is not alleged to be an "enterprise."

F.3d at 784.  Rule 9(b) requires Ray to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Williams*, 112 F.3d at 177.  Ray's complaint chronically omits essential information necessary to plead fraud under Rule 9(b).  For example, Ray asserts that the defendants "knowingly cypresent false information to courts, prosecutors, and probationers regarding false positives and alcohol detection."  SAC ¶ 19.  Statements such as these are woefully lacking any semblance of the specificity necessary to effectuate the purposes of Rule 9(b), including providing Recovery "fair notice" of the claims against it.  *Tuchman*, 14 F.3d at 1067.[23]  Finally, Ray often fails to identify the precise means of interstate commerce as required by the mail and wire fraud statutes.  Although this is not, strictly speaking, a Rule 9(b) requirement, any complaint that fails to allege the use of such means necessarily fails to state a claim of wire or mail fraud.  Ray's allegations fail to plead fraud with particularity and, therefore, cannot support a finding that Recovery engaged in a "pattern of racketeering activity."

Under Rule 9(b)'s liberal repleading paradigm, however, a district court should typically provide an opportunity to cure the deficient pleading "unless the defect is

---

[23]      To the extent that Ray argues that AMS and Recovery conspired to violate the RICO statute under § 1962(d), such pleading is improper until Ray properly pleads a RICO claim under § 1962(a), (b), or (c).  *North Cypress Medical Center Operating Company, Limited v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015).

simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart*, 199 F.3d at 247 n.6.  Although the court has granted Ray two opportunities to replead, Ray did not assert a RICO claim until her Second Amended Complaint.  Accordingly, Ray's RICO claim is dismissed without prejudice, allowing Ray an opportunity to replead.[24]

### 3.  State Law Claims

As Ray has been granted leave to amend, the court withholds judgment on Ray's remaining state law claims.

## III.  CONCLUSION

For the reasons stated above, the motions to dismiss are **GRANTED** in part and **DENIED** in part.  The court **GRANTS** the defendants' motions to dismiss with respect to Ray's civil rights claims brought under § 1983.  The court also **GRANTS** Recovery's motion to dismiss with respect to Ray's RICO claims.  However, the dismissal of Ray's RICO claims is without prejudice, and Ray is granted leave to amend her complaint to bring it into compliance, if possible, with Rule 9(b).  Ray shall have twenty-one days to file an amended complaint.  If no amended complaint is filed within that time, the RICO claim against Recovery will be dismissed with prejudice.

---

[24]   As the court has already afforded Ray several opportunities to replead, the court's grant of leave to amend is limited to Ray's RICO and state law claims. Ray should also state clearly whether she is pursuing an "association-in-fact" theory of racketeering liability.  *See* Response to Recovery at 14.

SO ORDERED.

March 22, 2021.

_A. Joe Fish_____
A. JOE FISH
Senior United States District Judge